the matter under advisement and call our second case this morning Bulatov v. Attorney General numbers 11-3048 and 11-4357. Mr. Spivak and Ms. Tyler. Good morning, Your Honors. My name is Lawrence Spivak. I represent the petition of Mikhail Bulatov. I'd like to respectfully request to reserve three minutes for recall time. That's fine. Go right ahead. Good morning, Your Honors. The Let me just ask one question here. Start off with some questions. When was Mr. Bulatov imprisoned in the late 90s? Was it 98, 99, or when? It was both, Your Honor. It was from approximately November 1998 through April 1999. So he was there about five, six months? Yes, Your Honor. Because, so if things were so bad, I counted up starting in June of 99, no, December of 99, excuse me, there's about eight or nine times he goes back and forth between the United States and either Russia or Kazakhstan. Is that correct? Yes, Your Honor. So how does – it's counterintuitive that there is a significant issue if he's going to continue going back and forth, back and forth many times. Well, no, Your Honor. Again, first of all, there was only one return trip to Kazakhstan after that for the purpose of selling what remained and trying to obtain Russian citizenship. He moved to Russia in 2000. He testified in the proceeding that he had no contact with any gang members on behalf of the corrupt officials or any indication in Russia that he was – he would have any problems with them until December 2002. After that encounter, he only left and returned once. There was a final threat in May 2003, a very serious threat, that he would be killed, and then he never returned at all. And during that time, of course, he had no knowledge that they were hatching this entire plan to pin a contract murder on him, which events transpired long after he was gone. And ironically, all these events start only after the Kazakh officials and the officials who were working with them in the Russian Government discovered this. And it's significant that the Interpol charges did not come to his knowledge until after he was placed in federal custody. He had no knowledge of this. Had he known of this, he probably would have applied for asylum much sooner, knowing that the Kazakh Government had the ability to reach across the ocean to try and find him. Because, first of all, as I mentioned earlier, they never did anything to try and find him for two and a half years in Russia. But when he went back these number of times, how many times of those eight or nine subsequent to his detention in 1998-99 did he go back to Kazakhstan? I believe he only went once at the end of 1999, after his release from detention. Has he been successful in getting Russian citizenship? Yes, he obtained it in 2000. That's why the government is trying to remove him to Russia, not to Kazakhstan. Okay. So it sounds like in Russia, which he's gone back to many times, what does he fear going back to Russia as opposed to Kazakhstan now? Well, he fears, first of all, that he would be persecuted on account of his nationality, his Jewish nationality, by the same group of corrupt officials that successfully confiscated his businesses in Kazakhstan, one of whom is this Colonel Kalikov, who brought the Yermolayevs in to threaten him in Russia in 2002 and again in 2003. Also what's significant, even if you look at the verdict that's come from Kazakhstan, that somehow these Yermolayev people were able to get two Russian police to cross over into Kazakhstan to prosecute the people who were supposedly actually carried out the contract murder. This is a Yermolayev who has no governmental connections whatsoever and somehow seems to have this incredible amount of influence that he can get Russian police to cross the border without any inter-country cooperation agreement to go prosecute a crime, investigate a crime in Kazakhstan. So, yes. Yeah, I was going to say, basically, whatever was going on in Kazakhstan and Russia, basically the IJA primarily, although he had other alternative thoughts, primarily ruled against your client because he felt on the grounds of credibility. Yes. And we're in a situation on appeal here where unless we can decide that a reasonable fact finder would be compelled to conclude your client was credible, the decision by the fact finder, i.e. the IJA, has to stand. What in the record would compel an appellate court to say that this fact finding that he wasn't credible, and that's the primary reason they ruled against your client, why are we compelled to find that to be in error? Well, first of all, because most of the alleged inconsistencies cited by the IJA don't even exist. Well, primarily the conviction that wasn't revealed, that's one of the things, if not the main thing he relied on. That's correct. And that was, whether it was a proper conviction or not, it was a conviction. And I think the IJA was very influenced by that, as anyone would be, that whether it was a proper conviction or political conviction or whatever, it wasn't revealed. However, the political nature of the prosecution could not have been brought up in the federal trial. The issue in the federal trial, at least for purposes of the charging document, is did you answer the question incorrectly on the I-485? Yes. And he agrees, yes, I answered the question incorrectly on the I-485, but it wasn't made clear to him that he had the opportunity to challenge. And in the scope of the federal charge, there really isn't any way to challenge the illegality of the arrests in Kazakhstan itself. But how could we, or should we, in what way could we say that the fact-finding by the IJA was, were compelled, not that we would have gone along with your position, as saying, because that's a reasonable position, I'll go that way. But we have to go beyond that and say, not only is it reasonable, but we're compelled to say that his fact-finding in determining that your client is not credible is something we're compelled to reverse, based on the record before us. Right. Because, as I pointed out in my brief, a lot of the alleged inconsistencies between the application and within the testimony don't exist. They say, for example, oh, he said he only suffered bruises, but he said I was beaten badly, very clearly. But the point is, let's just take one of those on that. He said he was beaten so badly that he thought he had a possible fractured skull. And there's no corroboration. But you don't really have to go to medical authorities in Kazakhstan to get the corroboration. For example, if you had a fractured skull, you could merely have an x-ray taken here. And let's just say he was a young person, which he wasn't, and you had a hairline-displaced fracture, it's going to show up. But again, he's saying he thought he had a fractured skull. He's not alleging throughout the continuation of the case that he did. What evidence did he have from doctors over here that showed that there was, at some point in time, this person had been abused in a way that sounds like he had some, from the descriptions, some permanent injuries? Well, Your Honor, again, he was in detention from day one and to the present day that he's in federal custody. It's extremely difficult to get a doctor, like when I have a client on the outside to go to Physician's Committee for Human Rights or someone else, it's extremely difficult to get someone into a detention facility for an examination. What, they're not allowed in? It's difficult to set it up. Why? The only way that I've ever been successful is when the U.S. Public Health Service has some evidence from their own treatment of the patient while he's in detention. You can't file a motion or a petition to have your doctor go in and examine the client? I'm not knowledgeable of that, so I won't. I just know that it wasn't done, and I know that I've had difficulty in that particular facility in getting anyone in to examine anybody at the Elizabeth Detention Center. This seems to relate somewhat to the IJ's challenging of your client about the lack of corroboration. His answer was sort of like, well, why would I? Didn't he say why at one point? He said why with regard to why would you need my father's letter, but not the – he showed them the scar on his nose in the hearing. Okay, this is where it is. He just couldn't prove the origin of it because he's not a medical expert. Well, the origin's critical though, right, because if it happened in a bar fight or something, that doesn't help your claim. But if it was the authorities beating him up, it does help your claim. Right, but again – So the fact of a broken nose or an injured nose isn't probative one way or the other. You have to tie it to the cause, right? That's part of it. Of course, the existence of the injury itself is there, and it hasn't been disputed by the government because trial counsel saw it. However, again, it is very hard to do, and it's an expedited proceeding. And he did not have the – he did not have any counsel until April 2010, and the hearing was only a few months later. But the – I mean, the letter from the father wouldn't have been that much to expect, would it? Except that he tried to show it to the IJ, and it turns out that Mr. DiRamondo had it in his file the entire time, but it was attached to another document, and that's why it wasn't produced. It was in – he admitted it was in his file. So there was a letter from the father. Absolutely, it was a letter from the father, and I produced it on the motion to reopen, in addition to which the prior IJ, Judge Reichenberg, said, you can have anyone testify telephonically over the phone from overseas. And the father stated in one of his later letters that he was ready to testify, but no one called him because it was a very long hearing, and it went to the end of the day, and perhaps that's why the IJ – perhaps that's why it wasn't presented, but he was available. Okay. And the letter, most compellingly in Mr. DiRamondo's response, he says, I have the letter, but it was attached to another 40-page document, and honestly it appears that Mr. DiRamondo just didn't bother to look at the 40-page document and see that the father's letter was attached to it. Incidentally, do we have jurisdiction for the review of the BIA's initial decision to extend it, challenge the agency's changed circumstance determination? Do we have jurisdiction to even hear that claim? Under existing precedent, it would certainly appear not. I'm arguing that the precedent should be overturned.  That's very conceivable. Okay. Other than that, harking back to Judge Ambrose's question to you, he was actually going back and claiming he was mistreating back to the early 1990s. The late 1990s, probably. He also said that he had threats when he bought the grocery chain. Yes. I thought it was back to the early 1990s. Back in 92, 93, 94. Okay. And yet during that period of time, as Judge Ambrose, you explicated here, he went back and forth any number of times. It doesn't make sense that if they were mistreating him that far back to the early 1990s, he would have been going, shuttling back and forth. I mean, is that something that the IJ could have taken into consideration? I believe that she just counted the number of trips and made a decision based on that. But more importantly, he sent his whole family to the United States in 1995. They never came back. Okay. He thought that he, and if you read his testimony, he thought that he could work it out by working with groups like the Yermolayevs and so on to counteract the corrupt officials and other groups. And those other groups basically just took his money and didn't do anything. But unfortunately, that appears to be a way of life for a minority businessman in Kazakhstan. He would be abhorrent here, but this is what he had to do in order to keep his business going. And the trips were necessary to pursue his business, and he had everything there. It would be extremely difficult for him to have lost at that time before his arrest. He had all these businesses, and he was hoping to kind of, you know, to pacify the government officials who wanted to take over the businesses and work some arrangement where they would stop bothering him. And it really wasn't until this arrest, this unjustified arrest occurred, that he realized that there's no way of pacifying anymore. I need to get out, and I need to get Russian citizenship. So if he's removed now, just to refresh what we talked about a few minutes ago, he'll be removed to Russia. Will there be an attempt from Kazakhstan to have him removed from Russia to Kazakhstan? Yes, but it may not be immediate. As we cited the Seidenfeld example, a person who Kazakhstan wanted stayed for eight months in a Russian prison before he was finally extradited. There's a good chance that Mr. Bulatov could be physically eliminated in a Russian prison where conditions are admittedly life-threatening before he ever gets to Kazakhstan. So just because there's a theoretical agreement doesn't mean he's ever going to get to Kazakhstan. Thank you. We'll hear from Ms. Tyler. Good morning, Your Honors. May it please the Court, my name is Julia Tyler, and I represent the Attorney General of the United States in this immigration case. I have two issues, one on the merits and one on the motion to reopen. On the merits, the I.J. Tatel here did a very comprehensive job. But when it came to adverse credibility, she said that the primary reason that she finds adverse credibility is because he had lied before, but what he did by pleading guilty was he actually told the truth that he had lied when he first came here. So in effect, she's double-dipping. She's saying because he told the truth about that he once upon a time lied, therefore he has to be found adversely credible. That doesn't really seem to – there's no cases that she cited that would allow you to do that. I'd be happy to address that, Your Honor. First, I don't think that the immigration judge relied primarily on – That was the first thing on page 21. It is the first thing she mentions, and I think she sets the groundwork. She says that the provision of false information in order to receive an immigration benefit discredits his current testimony and causes it to be viewed cautiously. Also, it's important to remember the chronology of these events. He filed his adjustment application in January of 2004, and then many years later, it took many years for the interview to take place. And during this time, Department of Homeland Security was communicating and trying to ascertain whether or not Miklo Limited had actually had a counterpart in Kazakhstan. And it was through that investigation that they ascertained from the Kazakh government that it was a fraudulent company, that the documents that had been submitted to create Miklo were fraudulent. And the Kazakh government also reported that he had been arrested for smuggling and forgery in April of 1998 and held there until – I'm sorry, November of 1998, and held there until April of 1999. Then Bulatov went to his adjustment interview. He was asked a second time whether or not everything that he stated in his I-485 application was correct. And he said it was. It was at that time that he was charged with his misrepresentation, at which point he did plead guilty. And he testified in his removal hearing that he pled guilty because he was guilty. I understand that they are now – that he is now making a technical – In fact, there he's now telling the truth. I pled guilty because I was guilty. Well, originally on direct examination, Judge Ambrose, he had all kinds of excuses for why he pled guilty. And he did not take ownership of his plea. He said that he had been told that his family was going to be deported. He said that he didn't think it was a legal arrest. And then on cross-examination, those areas were pursued. And he was asked, did you raise this issue that you did not believe your arrest in Kazakhstan was a legal arrest? Did you raise that with the judge? No, I didn't raise that with the judge. And he was eventually forced to admit, I pled guilty because I was guilty. And I also would like to comment that this argument from petitioners' counsel that this is some sort of – you know, this is some sort of a technical violation. When you say in a hearing that you pled guilty because you're guilty, he pled guilty to knowingly and intentionally providing fraudulent information on his adjustment application. And I think the immigration judge, although it was not her sole basis for finding him adversely credible, it was an important basis. But the other items were like he was a year or two off here, he was a year or two off there. They really pale – and she puts this one front and center. Could I – Judge Amber, could I address the issues of the trips back and forth? Sure, sure. Because I think that's a really, really important area. I want to – let me just get back very quickly here. It's important to remember in – I think one of you pointed out, he's been having trouble with these gangs since 1992 or 1993. He said that his business had been – I think his windows had been blown out, his offices had been destroyed. He claimed that he'd been stabbed in the chest as early as 1992 or 1993. He sends his family to the United States in 1995 because he calls it a savage country and they will not be safe there. He was arrested and detained in April of – in November of 1998, and he doesn't get released until April of 1999. He was told by these individuals while he was in prison, allegedly, that they'll find him anywhere. They will find him on the moon. And by the way, he was also told – and this is in the record at pages 376 to 378 – he was also told by Colonel Nagurliev about the killings of Hussein Saleh. He was told in prison, we will hang these killings on you. We can do that because he claims that Nagurliev told him it's our – we're the ones who tell who gets in and who gets out of Kazakh prison. So the notion that he had a new and unique reason to seek asylum in the United States because the Interpol warrant does not stand up against the facts. He was told in prison. Let me get quickly back to the trips back and forth. He waited eight months after he was released from the Kazakh prison in April of 1999 to even come to the United States. He stayed one month and he returned. He returned despite threats of harm and promises of ongoing punishment if he did not accede to their demands. He claimed he went back. Now, when he left in December of 1999, did he leave from Kazakhstan to the United States or from Russia? He left from Kazakhstan and he returned to Kazakhstan. And when he was asked about this, he testified that he needed to go back so he could sell some property that he had in Kazakhstan. But that doesn't make any sense because his father claims that after he got out of prison, he had nothing. He was laid bare. He had nothing but the shirt on his back. He testified on direct examination that after he was released from prison in April of 1999, he had nothing. He had no property. The banks had sold everything he owned. And yet, all of a sudden, he's got to go back and sell things. He starts a new business in Kazakhstan after he was released from prison. I don't know how someone does that when they have no assets. In Kazakhstan? I'm sorry? In Kazakhstan. In Kazakhstan. He started a new business in Kazakhstan selling energy. And let me quickly address also, because I think this is just as important. When did that new business start? Let's see. Roughly. I'm sorry. I don't have it at my fingertips, but he did. But it was after April of 1999. Oh, yes. It was April after that. Sorry. Let's see. In the record at page 402, he started a small business in Kazakhstan with the proceeds of a store that he now claims he had. He was buying energy from large suppliers and selling this energy to retail. But eventually, his office was set on fire. Let me ask you one question with regard to – go ahead. Do you want to finish up? I just wanted to address briefly the trip back and forth in December of 2002. Go ahead, and then I'll have a question for you about the motion to reopen. Okay. In December of – he was asked about this trip on cross-examination. Why did you return back to Russia in December of 2002? And he said, I returned to Russia because I did not yet know my life was in danger. Then he was confronted with the fact that he testified on direct examination that the day before he left in December of 2002, that he was threatened by Colonel Kolokov, who promised that they would find him. And he later admitted on cross that, in fact, in December of 2002, his life was in danger. As a matter of fact, during that confrontation in December of 2002, he testified, I left the next day. He was confronted – Colonel Kolokov gave him the name and the phone number and address of his family in the United States and said, we can find you anywhere. And yet still, he returned to Russia after that confrontation. So that is very, very telling. And then again, there is the inconsistency with regard to his meeting Mr. Saleh, who is sort of the source of all of his problems. I think you had another question. Yeah, a question about the – on the motion to reopen, the BIA said that the – you do not follow international corroboration, the ABDILAI standards. They've been overruled by Section 208B1B2 of the Immigration Act. But we have said after that in Chukwu, that's just not the case. ABDILAI's three-part test continues. Isn't that correct? Your Honor, we're not taking the position that – I think this Court has made it clear that they believe ABDILAI survives the REAL ID Act. Correct. If I could just clarify one thing about what the Board was saying, I think. First, I would point out that the Board actually cited ABDILAI in its first decision on the merits. And with respect to ABDILAI applying with regard to the Board's decision on the motion to reopen, it actually referenced 8 U.S.C. 1158B1B2, two little I's. This is the sustaining burden section of the statute. And it said that that is a new provision found in the REAL ID Act. And I think if you go back to originally ABDILAI and also this Court's decisions in Toure and Chukwu and Sandy, that this Court said that it basically couldn't apply its review standard under 8 U.S.C. 1252B4D, which is whether or not one can – My question is, I mean, I'm not sure this is going to help me much, but doesn't this call for just a remand for the BIA to reconsider whether the motion to reopen – It looks like what happens is you should bring the evidence in and you should assess it and then make a determination if you follow the three-part test in ABDILAI. And they wouldn't even allow the evidence to come in. Well, I think, Your Honor, as I said in my brief, even if this Court were to find that the Board erred in making that statement with regard to ABDILAI, it is harmless error because ABDILAI was followed in this case. That's what I was going to ask you. It looks strange to me that you said ABDILAI doesn't apply, but then it appeared to apply the ABDILAI factors. They absolutely did, and again – Why don't you demonstrate for us why that's actually the case? Well, I'd be happy to. Because I think we all agree it was a misstatement regarding ABDILAI. Well, for example, I mean, there was a tremendous amount of notice, for example, with regard to the documents that he was requested to supply. He was asked to supply really any kind of corroboration of any of the specifics of his claim. All of it was lacking. If the motion were reopened, they would have identified it, they would have admitted the letter from his father, and then they would have addressed his explanation for the lack of the records. They didn't do that. I'm not saying it's going to help him a heck of a lot. But I'm not sure, Judge, that ABDILAI is applying in the motion to reopen context so much as it's a question of whether or not ABDILAI was applied in the beginning, and ABDILAI was quite clearly applied. Well, then why would they, in the motion to reopen, say that ABDILAI doesn't apply? Because Mr. Bulatov was arguing that Mr. DiRamundo should have made an argument to the board, and he didn't, and therefore the alleged failure to apply ABDILAI was not exhausted. Does ABDILAI even apply when the primary reason that they denied his petition was credibility? That's exactly right. So do we even get to ABDILAI? Your Honor, you do not get to corroboration. ABDILAI, that's a backup issue. That's why I said I'm not sure it's going to help him a whole lot. I don't think you get to corroboration if he's not credible. Right. Right. But I think, again, he was asked for every kind of conceivable corroborative evidence. He was asked for a lease with Mr. Saleh. He was asked for police reports to back up his problems with his gangs in the early years. He was asked for medical records. He was asked for the letter from his father. He was asked for a letter from his attorney, and the judge specifically said, I mean, I'm sorry, he was asked for a letter from his attorney, and Bulatov said, oh, I didn't think that was necessary. He was asked for bank documents to establish the loan that the Kazakh government apparently set up for him. So, again, as this Court has said, this isn't a situation where someone is found credible, as is the point that Judge Cohen is going to, where he is found credible, and that he presented corroborative evidence, but somehow the immigration judge wanted more. He presented no corroboration of his injuries, of his mistreatment, of really anything that was critical to his claim. I don't think we have any further questions. Thank you very much, Your Honor. Thank you. Mr. Spivak. Your Honor, just in conclusion to the case. Let me just ask one thing. Ms. Tyra mentioned, for example, when Mr. Bulatov was in prison, that he reportedly was stabbed at one point. Is any scar shown to the IJ of a stab wound on the chest? There would be a scar. Not to my knowledge, Your Honor. That happened back in 1994. That was not when he was in prison. That was earlier. It really makes it really hard in our position to try to second-guess here, then. I mean, there's a significant test to be made, and it doesn't look as if you're even close to it. Well, Your Honor, again, the issue of the trips I want to go back to again. This is a man who had millions of dollars invested in shopping calls. No, but we're talking about just among the trips. The fact that he stayed in Kazakhstan for eight months before he left in December of 1999 doesn't help him. The trips back, the setting up the new business, but little things like the corroboration of a stab wound. If that's not there, how do you expect us to be able to have anything to say about whether there should be any kind of granting of a petition for review? Because you're asking about something that happened 16 years before the hearing. He didn't say that it was a deep stab wound and that he went to the hospital. When was the hearing? The hearing was in 2010. We're talking about a stab wound that allegedly occurred in 1994. Ninety-eight? No. Ninety-four? Ninety-four. But you still have a scar. You still have a scar. Not necessarily. It depends how superficial it is. Anyway, it wasn't presented, but you're making a factual determination at this point. The point is the burden. The immigration judge didn't use it. At this point, the burden, as it was before the withholding of removal because you were too late for asylum or CAT, the burden's on Mr. Bulatov. But again, he's met that burden by showing that there's a likelihood of future torture in Russia, conditions of life threatening. He was already threatened there. You have a 33 single-spaced page IJ opinion. It's probably the most comprehensive one I've ever read that goes through everything line by line. But as you pointed out, it's cast over the shadow of this federal conviction, making the assumption that he must be lying about everything else. And then we go through point by point and say that most of these inconsistencies don't exist, and the only one that can be pinned on is where he said four times that he met Sully in 1998, and he said once that he met him in 1997. I don't see how that is even a basis under the Real ID Act. That's sort of inherent in credibility, though, isn't it? You know, a witness takes a stand in a jury trial, and the witness testifies to ten things, and the jury doesn't believe the witness on the number one most important thing. Sometimes the jury assumes or determines that all of the other nine are also lies, and that could be completely wrong, but is that not the function of the fact finder? It's not the function of the fact finder when she's supposed to independently judge based on the testimony and the documents presented as to whether he has a past persecution or well-founded fear of persecution. And here she didn't do that. She cast everything based on the conviction, and certainly at least that's true. Well, when you say he's demonstrated it, you've put the rabbit in the hat because it's only demonstrated if all those things are true, and she's finding that they're not true, and she can't know one way or the other. She wasn't there. She can only look at the witness, listen to the witness, draw inferences. It's one of those classic trial judgment calls, isn't it? No, because there's no demeanor finding. There's no finding that his testimony is internally inconsistent. As a matter of fact, it's internally consistent, and it's consistent with what documentation he was able to produce. What's bothering her here is that you were convicted of lying, and he admits that he is lying. He never even had an opportunity to recant or anything, which normally happens in an immigration proceeding, because they were intent on arresting him for the Interpol warrants. Thank you.  Thank you to both counsel for a well-presented argument.